**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

Eastern District of Kentucky
**F I L E D**

JUL 18 2019

AT COVINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

| | | |
|---|---|---|
| MATTHEW C. BUTLER | : | |
| | : | |
| Plaintiff, | : | Case No. 2:19-cv-94-DLB-CJS |
| | : | |
| v. | : | Judge _____ |
| | : | |
| FERGUSON ENTERPRISES, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT AND JURY DEMAND

Comes now the Plaintiff, Matthew C. Butler ("Butler"), by and through his undersigned attorneys, and for his Complaint against the Defendant, Ferguson Enterprises, Inc. ("FEI"), states as follows:

### I.    Introduction

1.    This lawsuit arises out of the sale of all of the membership interests in Clawfoot Supply, LLC, d/b/a Signature Hardware (the "Company") by Butler and his father in 2016 to FEI pursuant to the terms of a Membership Purchase Agreement dated August 1, 2016 by and among FEI, Michael J. Butler and Butler, and Butler in his capacity as the Trustee of the Matthew Butler 2016 GRAT (the "MIPA").

2.    Pursuant to Section 1.06 of the MIPA, Butler is entitled to receive from FEI millions of dollars in Contingent Purchase Price ("CPP") payments if the Company achieves certain Trading Profit targets in fiscal years 2017, 2018 and 2019. Butler is also entitled to receive from FEI a Catch-Up Payment if the sum of the Company's Trading Profit for those fiscal years exceeds a certain target. FEI made the 2017 CPP payment to Butler. However, FEI has

intentionally avoided payment of the 2018 CPP due Butler.

3.      When the aforementioned sale of the membership interests in the Company closed,
Butler expected the Company to exceed the Trading Profit targets. Butler's expectation was
reasonably based on the historical growth of the Company since its organization on December 12,
2001. The Company did exceed the 2017 Trading Profit target and, as stated, FEI paid the 2017
CPP to Butler, in full. According to FEI's calculations, the Company failed to exceed the 2018
Trading Profit target.

4.      The Company's failure to exceed the 2018 Trading Profit target (if the Company
did indeed fail to exceed the 2018 Trading Profit) was due to FEI, directly or indirectly, taking
actions with the intent of avoiding or reducing the amount of the CPP in three ways, all in violation
of Section 1.06(j) of the MIPA.

5.      First, FEI imposed a new accounting rule on the Company which required the
Company to expense all inventory held for more than twelve months as "slow moving inventory"
(the "12-Month Rule"). Importantly, FEI's imposition of the 12-Month Rule on the Company
disincentivized the Company from growing profits through its historically lucrative purchases and
sales of new and unique products. Prior to FEI's imposition of the 12-Month Rule, the Company
invested approximately 30% of its pre-tax profit in purchasing new and unique products. The
Company purchased the majority of these products from international manufacturers, most of
whom required the Company to place large orders to defray shipping costs. As a result, the
Company had to hold new and unique product inventory for eventual resale to its customers for an
extended period of time (on average two years). Given the extended length of time required for
the Company to generate profit from the new and unique product inventory, the Company never
identified any of its inventory as obsolete and, therefore, did not expense any of its inventory as

2

"slow moving." While still employed at the Company, Butler advised FEI of his concerns over the negative impact of the 12-Month Rule on the Company's profit. In response, FEI Vice President, Chip Devine ("Devine"), promised Butler that FEI would repeal the 12-Month Rule. Devine further promised Butler that FEI would credit the 2018 Trading Profit calculation in the amount of $1,015,524 in an effort to offset the negative impact of the 12-Month Rule on the Company's profits. But FEI continued to impose the 12-Month Rule on the Company and never provided Butler with the credit to the 2018 Trading Profit calculation as it promised. FEI's deliberate decision to impose the 12-Month Rule on the Company stifled the Company's ability to profit from the sales of new and unique products—sales that had been historically lucrative for the Company.

     6.   Second, FEI intentionally terminated and poached the Company's key employees, which hampered the Company's ability to maximize profits. Thus FEI terminated Butler in December 2017, without cause, despite Butler's proven ability to substantially grow the Company's profits over the fourteen-year period preceding the FEI acquisition. In the spring of 2018, FEI terminated the Company's Vice President of Sourcing and the Company's Chief Operating Officer—two key employees who made substantial contributions to the Company's profitability. Also in the spring of 2018, FEI hired away from the Company a key employee responsible for its reverse logistics strategies, which previously allowed the Company to profit from the resale of returned products. Following FEI's poaching of this key employee, FEI decided to stop reselling the Company's returned products, and thereby eliminated a source of income and replaced it with an expense. Again in the spring of 2018, FEI hired away from the Company a key employee tasked with maintaining the Company's growing facilities and overseeing lean initiatives; an action which resulted in additional expenses for (and less profit to) the Company.

3

7.     Third, FEI modified the Company's incentive bonus programs by promising the Company's employees that they would be paid bonuses irrespective of whether the Company hit certain profits goals. This decision by FEI directly reduced the Company's Trading Profit by (a) removing any incentive Company employees had to improve profitability, and (b) increasing the Company's expenses in the form of unearned bonus payments.

8.     By letter dated March 29, 2019, and mailed via UPS overnight mail, Butler, through counsel, notified FEI in accordance with the MIPA that he disputed its calculation of the 2018 Trading Profit to his detriment. The bases for Butler's claim were set forth in said letter and are summarized, in part, in the preceding paragraphs 4 through 7. In the letter, Butler demanded that FEI pay him the maximum amount of the 2018 CPP, *i.e.*, $6,666,667.

9.     FEI received Butler's March 29, 2019 notice on April 1, 2019.

10.    FEI did not provide written notice that it disputed anything set forth in Butler's March 29, 2019 notice in the 15-day period after its receipt of same.

11.    Pursuant to Section 8.03 of the MIPA, FEI agreed to indemnify Butler from losses resulting from, arising out of, or incurred by Butler with respect to any breach by FEI "of any covenant or agreement contained in this Agreement[.]"

12.    Pursuant to Section 8.05 of the MIPA, FEI's failure to dispute the contents of Butler's March 29, 2019 notice in accordance with the MIPA resulted in Butler's demand for $6,666,667 being "conclusively deemed a Loss subject to indemnification hereunder."

13.    Pursuant to Section 8.08 of the MIPA, the indemnities provided for in the MIPA, subject to certain inapplicable exceptions, are the "sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement[.]"

4

14.    Notwithstanding the foregoing indemnification provisions, the MIPA also contains a truncated and expedited dispute resolution process to be overseen by "a regionally recognized accounting firm," denominated as an "Independent Expert," to address certain limited disputes that arise out of FEI's calculation of the Trading Profit targets which determine Butler's entitlement to receive CPP payments.  (MIPA §§ 1.05(d) and 1.06I)

15.    Due to the uncertainty and dispute over whether Butler must submit his claims for FEI's breach of Section 1.06(j) of the MIPA (*i.e.*, a "covenant and agreement contained in" the MIPA), and because Butler is entitled to equitable relief and indemnity for FEI's breaches of its covenants and agreements in the MIPA, Butler now brings this Complaint seeking: (a) a judgment declaring that Butler's claims asserted herein are not subject to the dispute resolution process set forth in Section 1.06(c) of the MIPA, (b) an order (i) enjoining FEI from commencing the dispute resolution process set forth in Section 1.06(j) of the MIPA until the Court adjudicates this claim for declaratory relief, and (ii) enjoining FEI from commencing the dispute resolution process set forth in Section 1.06(c) of the MIPA until such time as the Court fully and finally adjudicates Butler's claims for equitable relief and indemnity, which may render the MIPA's dispute resolution process unnecessary; and (c) indemnity, damages and expenses for FEI's breaches of Section 1.06(j) of the MIPA, which provides that FEI "shall not, directly or indirectly, take actions with the intent of avoiding or reducing the amount of the [CPP]."

## II.    Parties, Jurisdiction and Venue

16.    Butler is a citizen of the Commonwealth of Kentucky who resides in Kenton County, Kentucky.  Butler is identified in the MIPA as "Matt Butler" and as one of the "Sellers."

17.    FEI is a foreign corporation existing under the laws of the Commonwealth of Virginia with its principal place of business located at 12500 Jefferson Avenue, Newport News,

Virginia. FEI is identified in the MIPA as the "Purchaser."

18.     There is complete diversity of citizenship between Butler and FEI.

19.     The amount in controversy exceeds $75,000, exclusive of interest, costs and

attorneys' fees.

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1332(a).

21.     This Court has personal jurisdiction over FEI, and venue in this District is proper

as the parties agreed in the MIPA that:

> Any Proceeding permitted by the terms of this Agreement to be filed in a court,
> which Proceeding is brought to enforce, challenge or construe the terms or making
> of this Agreement or any of the Related Agreements, and any claims arising out of
> or related to this Agreement or any of the Related Agreements, shall be exclusively
> brought and litigated in a state or federal court having subject matter jurisdiction
> and located in Kenton County, Kentucky. For the purpose of any Proceeding
> instituted with respect to any claim arising out of or related to this Agreement or
> any of the Related Agreements, each Party hereby irrevocably submits to the
> exclusive jurisdiction of the state or federal courts having subject matter jurisdiction
> and located in Kenton County, Kentucky. Each Party hereby irrevocably waives
> any objection or defense which such Party may now have or hereafter have of
> improper venue, forum non conveniens or lack of personal jurisdiction.

(MIPA § 9.13(b)) *See also Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009) (*citing*

*Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) for the proposition that "[a] forum

selection clause should be upheld absent a strong showing that it should be set aside.").

22.     Venue is also proper because "a substantial part of the events or omissions giving

rise to [Butler's] claim[s] occurred" in this District. *See* 28 U.S.C. § 1391.

## III.   **Facts**

### A.     **Background**

23.     Butler organized the Company as a limited liability company in 2001 under the

laws of the Commonwealth of Kentucky. The Company is located at 2700 Crescent Springs Pike,

Erlanger, Kentucky. The Company is engaged in the sale of home goods, primarily fixtures and hardware for use in bathrooms and kitchens. From its inception and continuing through 2016, when the Company was acquired by FEI, the Company generated substantial profits from its e-commerce sales, *i.e.*, sales of products over the internet. The Company purchased large volumes of product it sold to its customers from overseas manufacturers, primarily located in Asia.

24. Prior to the FEI's acquisition of the Company, Butler and his father were the sole membership interest holders of the Company.

**B.**    **Relevant Terms of the MIPA**

25. FEI purchased all of the membership interests in the Company from Butler and his father pursuant to the terms of the August 1, 2016 MIPA.

26. In addition to the payment Butler received from FEI at closing, he was also eligible to receive CPP payments pursuant to Sections 1.06(d) through (g) of the MIPA, which read:

(d)    2017 Contingent Purchase Price. If the Trading Profit for the period starting on the Closing Date and ending July 31, 2017 as finally determined in accordance with this Section 1.06 (the "2017 Trading Profit") is greater than or equal to $27,911,195 (the "2017 Threshold"), then the Purchaser shall pay to Matt Butler as additional Contingent Purchase Price an amount equal to $3,333,333 plus an amount equal to 83.3% of the amount by which 2017 Trading Profit is greater than the 2017 Threshold; provided that the Contingent Purchase Price paid pursuant to this Section 1.06(d) shall not exceed $6,666,667. Such amount shall be paid within five (5) business days following the final determination of the 2017 Trading Profit in accordance with this Section 1.06.

I    2018 Contingent Purchase Price. If the Trading Profit for the 12-month period ended July 31, 2018 as finally determined in accordance with this Section 1.06 (the "2018 Trading Profit") is greater than or equal to $31,740,538 (the "2018 Threshold"), then the Purchaser shall pay to Matt Butler as additional Contingent Purchase Price an amount equal to $3,333,333 plus an amount equal to 83.3% of the amount by which 2018 Trading Profit is greater than the 2018 Threshold; provided that the Contingent Purchase price paid pursuant to this Section 1.06I shall not exceed $6,666,667. Such amount shall be paid within five (5) business days following the final determination of the 2018 Trading Profit in accordance with this Section 1.06.

7

(f)     2019 Contingent Purchase Price. If the Trading Profit for the 12-month period ended July 31, 2019 as finally determined in accordance with this Section 1.06 (the "2019 Trading Profit") is greater than or equal to $36,386,808 (the "2019 Threshold"), then the Purchaser shall pay to Matt Butler as additional Contingent Purchase Price an amount equal to $3,333,333 plus an amount equal to 83.3% of the amount by which 2019 Trading Profit is greater than the 2019 Threshold; provided that the Contingent Purchase Price paid pursuant to this Section 1.06(f) shall not exceed $6,666,667. Such amount shall be paid within five (5) business days following the final determination of the 2019 Trading Profit in accordance with this Section 1.06.

(g)     Catch-Up Payment.     If Aggregate Trading Profit as finally determined in accordance with this Section 1.06 is greater than or equal to $108,038,541, then the Purchaser shall pay to Matt Butler as additional Contingent Purchase Price an amount equal to (A) $20,000,000 minus (B) the sum of the Contingent Purchase Price paid pursuant to Section 1.06(d), Section 1.06I and Section 1.06(f). Such amount shall be paid within five (5) business days following the final determination of the Aggregate Trading Profit in accordance with this Section 1.06.

27.     Pursuant to 1.06(a)(i) of the MIPA, the Company's Trading Profit is to be calculated in accordance with International Reporting Standards ("IFRS"), and was to exclude the CPP paid to Butler, and also was to exclude Retention Bonuses. Furthermore, the Company's Trading Profit includes mutually agreed upon credits for the Company's satisfactory performance and cooperation with any special initiatives and projects.

28.     Under Section 1.06(b) of the MIPA, FEI is required to deliver its calculation of the Company's Trading Profit, along with reasonable documentation supporting its Trading Profit calculation, to Butler within 75 days of July 31 of the Company's 2017-2019 fiscal years.

29.     Under Section 1.06(j) of the MIPA, FEI's discretion to operate the Company during the CPP period is limited as follows: "(i) as long as Matt Butler continues to be employed by the Company, [FEI] shall endeavor in good faith to communicate with Matt Butler regarding the general operations of the Company and (ii) [FEI] shall not directly or indirectly, take any actions with the intent of avoiding or reducing the amount of the [CPP]."

8

30.    In the MIPA, FEI agreed to indemnify Butler as follows:

[FEI] shall indemnify and defend the Sellers and their respective Affiliates, heirs, successors and assigns (the "Seller Indemnitees") against, and shall hold them harmless from, any and all Losses resulting from, arising out of, or incurred by any Seller Indemnitee in connection with, or otherwise with respect to (i) any inaccuracy or breach of any representation or warranty made by [FEI] in this Agreement or any of the Related Agreements (without regard and without giving any effect to any "materiality" or "material adverse effect" qualification contained in any such representation or warranty); or (ii) any breach by [FEI] of any covenant or agreement contained in this Agreement or any of the Related Agreements.

(MIPA § 8.03)[1]

31.    Section 8.05 of the MIPA reads as follows:

Non-Third Party Claims.  In the event of a claim that does not involve a Third Party Claim being asserted against it, the Indemnified Party shall send a notice of claim to the Indemnifying Party.  The notice of claim shall set forth the amount, if known, or, if not known, an estimate of the foreseeable maximum amount of claimed Losses) and a description of the basis for such claim.  The Indemnifying Party will have fifteen (15) business days from receipt of such notice of claim to dispute the claim and will reasonably cooperate and assist the Indemnified Party in determining the validity of the claim for indemnity.  If the Indemnifying Party does not give notice to the Indemnified Party that it disputes such claim within fifteen (15) days after its receipt of the notice of the claim, the claim specified in such notice of claim will be conclusively deemed a Loss subject to indemnification hereunder.

32.    The indemnities provided for in the MIPA, subject to certain inapplicable exceptions, are the "sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement[.]"  (MIPA § 8.08)

33.    Section 9.05 of the MIPA sets forth the manner in which notices and demands made pursuant to the MIPA are to be provided to the parties, pursuant to which all such notices and demands must be in writing.

---

[1] The MIPA's definition of "Losses" includes "any and all losses [and] damages" as well as "expenses (including legal, consultant, accounting and other professional fees)[.]"  (MIPA § 8.02(a).

9

34.    The MIPA also contains a truncated and expedited dispute resolution process to be overseen by "a regionally recognized accounting firm," denominated as an "Independent Expert," to address certain limited disputes that arise out of FEI's calculation of the Company's Trading Profit, which is hereinafter referred to as "Calculation Objection Dispute Resolution Provision." (MIPA §§ 1.05(d) and 1.06I)

35.    The MIPA's Calculation Objection Dispute Resolution Provision does not allow for the taking of depositions, formal discovery, or a hearing; in fact, it provides that the Independent Expert accounting firm "shall base its decision solely upon written submissions by [FEI] and Matt Butler and not on an independent review." (MIPA § 1.06I)

36.    Furthermore, while the Independent Expert accounting firm may "reasonably request[]" relevant books and records from FEI and/or Butler, it is not required to do so. (*Id.*)

37.    The Independent Expert accounting firm does not have any authority pursuant to the MIPA, or otherwise, to determine which of the parties' disputes are governed by the Calculation Objection Dispute Resolution Provision and which are not.

38.    The Calculation Objection Dispute Resolution Provision and any relief it may afford is not expressly characterized as "exclusive" by the MIPA, in contrast to the indemnification remedy set forth in Section 8.08 of the MIPA. Indeed, the MIPA expressly provides that "either [FEI] or Butler *may* submit the specific matter or matters in dispute to the Independent Expert" accounting firm—the MIPA does *not require* that matters in dispute be submitted to the Independent Expert accounting firm. (MIPA § 1.06I; emphasis added)

39.    Although the Independent Expert accounting firm presumably would have expertise in accounting issues concerning disputes that arise out of FEI's calculation of the Company's Trading Profit, it more than likely does not possess expertise in legal issues and

10

business operational issues implicated by Butler's claims in this lawsuit that FEI breached certain covenants and agreements of the MIPA, namely those covenants and agreements set forth in Section 1.06(j) of the MIPA.

## C.  FEI's Payment of the 2017 CPP and Non-Payment of the 2018 CPP

40.     On August 30, 2017, FEI notified Butler that it would pay Butler 100% of the 2017 CPP, and paid Butler accordingly.

41.     However, in 2018, FEI notified Butler that the Company, by FEI's calculation, failed to meet the threshold for the 2018 CPP and that, as a result, Butler would be paid nothing for the 2018 CPP.

42.     By letter agreements dated October 29, 2018, November 28, 2018, January 29, 2019, and February 27, 2019, FEI and Butler agreed to extend the deadline for Butler to object to FEI's calculation that the Company failed to meet the threshold for the 2018 CPP to April 1, 2019.

43.     By letter dated March 29, 2019, Butler, through counsel, notified FEI that he disputed its FEI's calculation that the Company failed to meet the threshold for the 2018 CPP.  In that correspondence, Butler provided the bases for his dispute and demanded that FEI pay him the maximum amount of the 2018 CPP, *i.e.*, $6,666,667.

44.     As set forth in Section III.D. below (and as is also set forth in Butler's March 29, 2019 correspondence to FEI), the Company's failure to exceed the 2018 CPP threshold was the direct and proximate result of FEI taking actions with the intent of avoiding or reducing the amount of the CPP in breach of FEI's obligations set forth in Section 1.06(j) of the MIPA.

45.     FEI received Butler's March 29, 2019 notice on April 1, 2019, but FEI did not provide written notice that it disputed anything set forth in Butler's March 29, 2019 notice in the 15-day period after its receipt of same.  Therefore, pursuant to Section 8.05 of the MIPA, Butler's

11

demand for $6,666,667 is "conclusively deemed a Loss subject to indemnification hereunder."

### D.   FEI's Breaches of Section 1.06(j) of the MIPA

#### (i).   FEI breached Section 1.06(j) of the MIPA by unilaterally imposing a new expense on the Company for "slow moving inventory."

46.   Prior to being acquired by FEI, almost all of the Company's year-over-year growth came from the Company's e-commerce sales of new and unique products. To facilitate this growth, the Company invested approximately 30% of its pre-tax profit in purchases of new and unique products. The vast majority of the new and unique products purchased by the Company were procured from small to medium sized international manufacturers with which the Company had developed relationships over many years. Given the manufacturers' size and location, most manufacturers required the Company to place large orders to lower shipping costs.

47.   The aforementioned constraints on the Company's procurement of new and unique products made by overseas manufacturers resulted in the Company holding new and unique product inventory for resale for an extended period of time. Thus it took, on average, two years from the time the Company identified the new and unique products it would purchase to the time the Company sold those products to its customers. Considering the length of time required to generate its profit from the sale of new and unique products, prior to FEI's acquisition of it, the Company never identified any of its inventory as obsolete and, therefore, did not expense any of its inventory as "slow moving."

48.   Despite analyzing the Company's more than 10-year track record of sales growth during its pre-acquisition due diligence, after purchasing the Company, FEI intentionally imposed a new accounting rule on the Company, requiring it to expense all inventory held for more than 12 months ("12-Month Rule") as "slow moving inventory." FEI intentionally imposed the new 12-Month Rule on the Company notwithstanding the fact that FEI did not impose the 12-Month Rule

12

on its own brand product inventory and notwithstanding that the 12-Month Rule is not required by IFRS or the MIPA.[2]

49.     FEI's imposition of the 12-Month Rule on the Company had two effects. First, the new accounting expense immediately reduced the Company's Trading Profit. Second, the Company's efforts to grow profits through historically lucrative purchases and sales of new and unique products—sales which necessarily required a long time to materialize—were disincentivized.[3]

50.     In July 2017, Butler notified FEI Vice President, Chip Devine ("Devine") of the 12-Month Rule's negative impacts on the Company's Trading Profit, and told him it would take approximately six months to fix the issues once the 12-Month Rule was reversed.

51.     After being alerted to the negative impacts resulting from FEI's imposition of the 12-Month Rule, Devine promised Butler that FEI would repeal the 12-Month Rule and would credit the 2018 Trading Profit account in the amount of $1,015,524 in an attempt to offset the 12-Month Rule's negative impact.

---

[2] FEI did not disclose to the Company or Butler that FEI's brand product inventory was exempt from the 12-Month Rule until the fall of 2017.

[3] The Twelve Month Rule also led to the departure of Howard Law ("Law") from the Company in December of 2016, which FEI recognized as a significant loss to the Company's overall business. FEI's intent to avoid or reduce the Company's Trading Profit in violation of Section 1.06(j) of the MIPA is also evidenced by its refusal to enforce Law's non-compete agreement and allow him to immediately begin working for Barclay Products Limited ("Barclay"), one of the Company's competitors. FEI claimed its decision to allow Law to violate his non-compete without consequence was because Barclay Products was a customer of FEI. But that pretext does not excuse FEI's conduct. Law's employment with Barclay was substantially certain to harm the Company's sales and, in fact, did harm the Company's sales because after Law was employed by Barclay, it stopped purchasing from the Company and started purchasing directly from the Company's vendors by exploiting the very same relationships Law developed while employed by the Company.

13

52.     Devine's promises to Butler were acknowledged by FEI's Chief Financial Officer, Bill Brundage ("Brundage"), during a visit Brundage made to the Company on November 30, 2017, when he met with Butler. Despite these promises, FEI never reversed the 12-Month Rule and never applied the $1,015,524 credit to the 2018 Trading Profit Calculation.

53.     On December 6, 2017, FEI terminated Butler's employment, without cause. And, in the spring of 2018, FEI terminated Tracy Beehn ("Beehn") from her position as the Company's Vice President of Sourcing in the spring of 2018, decisions which effectively halted the Company's purchase (and historically lucrative sales) of new and unique products.

54.     FEI's deliberate decisions to stifle the Company's ability to profit from the sale of new and unique products directly reduced the Company's Trading Profit. Specifically, from 2005 to 2016 the Company's sales increased 26.88% on average year-over-year. In 2017 and 2018, after FEI purchased the Company and imposed the 12-Month Rule, the Company's sales increased 1.96% and .41%, respectively. This drastic decline in sales directly reduced the Company's Trading Profit and can only be explained by FEI's intention to avoid or reduce the amount of the CPP owed to Butler. Therefore, in intentionally implemented a new accounting rule that directly reduced the Company's Trading Profit, FEI breached Section 1.06(j) of the MIPA.

### *(ii).   FEI breached Section 1.06(j) of the MIPA by terminating and poaching the Company's key employees.*

55.     A key reason for the Company's continued growth was its ability to successfully attract and retain individuals with the specialized skills necessary to identify and purchase new and unique products, and efficiently scale the Company's warehousing. However, six months after FEI terminated Butler, FEI also terminated, or poached for its own benefit, the Company's key employees who possessed these specialized skills. FEI's intentional decision to terminate or move these key employees directly reduced the Company's Trading Profit.

14

56.     As stated, in the spring of 2018, Ferguson terminated Beehn's employment with the Company. In her role as Vice President of Sourcing at the Company, Beehn was responsible for identifying and purchasing the new and unique products accountable for the Company's continued growth. Beehn's position was highly specialized, as only a handful of individuals nationwide possess the experience and expertise similar to hers. Upon information and belief, the role of Vice President of Sourcing has remained vacant at the Company since FEI's termination of Beehn. By terminating Beehn and not installing a suitable replacement for her, FEI effectively stopped the Company's sale of new and unique products, which, as discussed, was crucial to the Company's continued double-digit sales growth.

57.     Also in the spring of 2018, FEI terminated the Company's Chief Operating Officer, Ann Samler ("Samler"). Prior to her termination, Samler was responsible for efficiently scaling the Company's warehousing capabilities. Like the sourcing field, individuals with the skills and experience necessary to efficiently scale warehouse space are extremely rare. In addition to draining the talent required to run the Company, FEI's decision to terminate Samler also had a direct and immediate impact on the Company's Trading Profit. From the time she was hired in August 2016 until Butler's termination, Samler reduced the Company's warehouse labor costs by about $400,000 a year, while at the same time growing the Company's warehousing capabilities. Given her track record of success at the Company, Samler's termination all but guaranteed that the Company's expenses would increase and, therefore, its Trading Profit would decrease.

58.     Besides terminating key employees of the Company, FEI poached other key employees from the Company for its own benefit.

59.     In the spring of 2018, FEI hired David Kubichek ("Kubichek") away from the Company for itself. Prior to being reassigned to FEI, Kubichek was responsible for creating and

developing the Company's reverse logistics strategies, which allowed the Company to profit from the resale of returned products as well as the newly obsolete inventory created by the 12-Month Rule. A few months after Kubichek was reassigned to FEI, he quit. Upon information and belief, with Kubichek's departure, FEI will no longer resell the Company's returned products or obsolete inventory for profit, opting instead to simply destroy it at a fixed cost. FEI's decision to do so directly reduces the Company's Trading Profit by cementing the 12-Month Rule's negative impact of eliminating a source of income and replacing it with an expense.

60.    In June 2018, FEI also reassigned Pamela Mills ("Mills") from the Company to FEI. The Company hired Mills in December 2016 from General Cable to maintain the Company's growing facilities and oversee lean initiatives. Along with Samler, Mills was central to the Company's ability to grow its warehousing capabilities while reducing labor costs. Accordingly, as was the case with Samler, FEI's decision to remove Mills from the Company all but guaranteed that the Company's expenses would increase and, therefore, its Trading Profit would decrease.

61.    By far the most damaging employment decision FEI made was its December 2017 decision to terminate Butler's employment with the Company without cause. As evidenced by Butler's proven ability to grow the Company into the hundred million dollar e-commerce business FEI purchased, Butler's experience, expertise and management strategies were an invaluable part of the Company's continued growth as an e-commerce business.

62.    While represented to be without cause, FEI terminated Butler to facilitate the immediate sale of the Company's products in FEI showrooms and to recast the Company as an "owned store brand" for sale in FEI showrooms – both of which Butler opposed. Butler opposed these objectives because they would immediately reduce the Company's Trading Profit during the term of the CPP payments by shifting revenue from the Company to FEI.

16

63.     As Butler explained to FEI shortly before he was terminated, the Company's successful e-commerce business was built, in part, on its ability to profitably sell its new and unique products at a price that could not be effectively matched by brick-and-mortar retailers. The reason brick-and-mortar retailers could not match the Company's price was due to the substantial overhead required to maintain physical retail facilities and employ sales staff.

64.     Given these business realities, in order to sell the Company's products in FEI showrooms, FEI required the Company to discount the products it sold to FEI, while at the same time increasing the retail price of the Company's products sold to consumers, both online and in store.[4]  To offset the effect of the Company-to-FEI discount on the Company's Trading Profit, FEI gave the Company a corresponding credit.

65.     The Company-to-FEI discount was necessary because without it FEI would be unable to make a profit on the resale of the Company's products.

66.     The increase in price of the Company's products was done to cover, in part, FEI's showroom overhead and also to eliminate the disparity between what the Company charged online and what FEI charged in store. The disparity between the Company's price and FEI's price was important to FEI's sales because the greater the disparity, the more customers decided to purchase from the Company at the reduced e-commerce expense instead of FEI at the greater showroom expense. The increase in price, however, naturally reduced customer sales (whether online or directly to FEI for resale in FEI showrooms) and, therefore, the Company's Trading Profit.

67.     In addition to directly reducing the Company's sales revenue, selling the

---

[4] Upon information and belief, the increase in the price of the Company's products was not a one-time occurrence. Rather, FEI is continuing to require the Company to increase the price of its products. Of course, the continuing increase in price puts the Company's e-commerce business at a distinct disadvantage vis-à-vis its online competitors, *e.g.*, Amazon, thus negatively impacting the Company's Trading Profit.

Company's products in FEI showrooms – irrespective of the ultimate sales price – also shifted
initial customer purchases from the Company's website to FEI's showrooms. By shifting sales to
FEI, the Company was not only deprived of the initial sale but was also deprived of the customer
information necessary to market the sale – and/or future sale – of related (*i.e.*, matching fixtures
or accessories) and different products, thereby further reducing the Company's sales and Trading
Profit.

68.    Finally, by making the Company's products an "owned store brand" sold in FEI
showrooms, FEI further reduced the Company's sales by directly competing with its e-commerce
business, reducing the number of products sold on the Company's website and instead driving
"destination" sales through FEI showrooms.

69.    Immediately after terminating Butler and removing his substantial e-commerce
experience from the Company, FEI hired one of its showroom managers from California named
Keith Hammond ("Hammond") who had no meaningful e-commerce experience.

70.    Hammond's lack of skill, applicable experience, and directive to immediately shift
the Company's sales to FEI showrooms is evidenced by the Company's performance since he took
over.    Specifically, since Hammond was installed at the Company by FEI, the Company's
advertising expenses increased nearly $500,000 per month over historical benchmarks, which
included expenses for ineffective advertising focused on improving showroom sales (*i.e.*,
professional team sponsorships, radio advertising, and magazines) as opposed to the Company's
historically lucrative e-commerce business, and FEI increased the Company's prices while at the
same time branding the Company's products as FEI's "owned store brand" products.

71.    Also, since FEI's termination of Butler and installation of Hammond, FEI has
continued to cause the Company to significantly decrease its purchase and sale of historically

18

lucrative new and unique products procured from overseas manufacturers.

72.     FEI's deliberate decisions to terminate the Company's key employees or hire them for itself, directly reduced the Company's Trading Profit by eliminating the talent needed to continue the Company's growth and immediately ending the Company's cost reduction measures. Moreover, FEI's decisions to replace the Company's key employees, if at all, with inexperienced personnel who have taken concerted actions to shift the Company's sales to FEI showrooms will continue to directly reduce the Company's Trading Profit throughout the remaining term of the MIPA. Because these actions can only be explained by an intention to avoid or reduce the Company's Trading Profit (and, consequently, the CPP owed to Butler), FEI's decisions to terminate or poach the Company's key employees represent another breach of Section 1.06(j) of the MIPA.

### (iii).    *FEI breached Section 1.06(j) of the MIPA by promising the Company's employees that incentive bonuses would be paid regardless of whether profit goals were achieved.*

73.     Vital to the Company's long-term growth strategy was its culture of providing employees with a stake in the Company's financial success. The Company created this culture over more than a decade by thoughtfully creating and implementing employee incentive bonus programs tied to the Company's overall profitability.

74.     Given the direct stake in the Company's success created by these employee incentive programs, the Company's culture focused on increasing the Company's overall profit, rather than short-term benefits to specific roles or departments. As evidenced by the Company's long history of growth and profitability, the Company's employee incentive bonus programs were immensely successful (and profitable for both the Company and its employees).

75.     In January of 2018, however, FEI cancelled the Company's incentive bonus

programs and promised employees that bonuses would be paid regardless of the Company's overall profit. Obviously, this decision directly reduced the Company's Trading Profit by not only removing any incentive Company employees had to improve the Company's overall profitability, but also by directly increasing the Company's expenses in the form of unearned bonus payments. Given these simultaneous negative effects, FEI's decision to pay bonuses irrespective of performance was made with the intent to directly or indirectly reduce the Company's Trading Profit and the CPP payable to Butler.

76.     Upon information and belief, FEI was able to adjust for, in part, each of the aforementioned negative impacts on the Company's profit with the savings it realized by not paying Butler the remaining amount of the CPP.

## IV.    Claims

### COUNT I: Declaratory Judgment that Butler's Claims Are Not Subject to the Calculation Objection Dispute Resolution Provision of the MIPA

77.     Butler restates and incorporates by reference the preceding paragraphs 1 through 76 as if fully set forth herein.

78.     A controversy exists regarding which tribunal, *i.e.*, the Independent Expert accounting firm or this Court, has authority to decide Butler's claims for FEI's breaches of its covenants and agreements in Section 1.06(j) of the MIPA.

79.     This Court has discretion pursuant to 18 U.S.C. § 2201 to interpret and construe the MIPA and declare whether Butler's claims are appropriately resolved by this Court or through the process set forth in the Calculation Objection Dispute Resolution Provision of the MIPA.

80.     A declaration by this Court as to whether this Court or the Independent Expert accounting firm has authority to decide Butler's claims will resolve disputes and uncertainty regarding same and is substantially more efficient than requiring the parties to complete the

process set forth in the Calculation Objection Dispute Resolution Provision of the MIPA only to

have the Independent Expert accounting firm's decisions vacated or modified as a result of FEI's

breaches of its covenants and agreements in Section 1.06(j) of the MIPA.

### COUNT II: Injunctive Relief Barring Commencement of
### the Process Set Forth in the Calculation Objection Dispute Resolution Provision

81.    Butler restates and incorporates by reference the preceding paragraphs 1 through

80 as if fully set forth herein.

82.    Butler will be irreparably harmed should continuing uncertainty and disputes force

Butler to submit his claims to the process set forth in the Calculation Objection Dispute Resolution

Provision of the MIPA, which should not be the process utilized to decide his claims for FEI's

breaches of its covenants and agreements in Section 1.06(j) of the MIPA, and which process was

never intended or designed to decide such claims, and that if such claims are decided by that

process, the likely result is that the Independent Expert accounting firm's decision will be vacated

or modified by this Court.

83.    Butler has no adequate remedy at law for the declaratory relief he is seeking herein,

and forcing him to submit his claims for FEI's breaches of its covenants and agreements in Section

1.06(j) of the MIPA to the Independent Expert accounting firm pursuant to Section 1.06I of the

MIPA, a process never agreed to and never intended or designed to address such claims, likely

would deprive Butler of any viable remedy for such claims.

84.    Provisional injunctive relief is required to preserve the status quo until such time as

the Court declares whether Butler's claims for FEI's breaches of its covenants and agreements in

Section 1.06(j) of the MIPA will be decided by this Court or the Independent Expert accounting

firm.

85.    Butler's claim for declaratory relief is likely to be successful, because the language

21

of the MIPA, and the applicable case law, demonstrate that the parties did not intend for the Independent Expert accounting firm to decide Butler's claims for FEI's breaches of its covenants and agreements in Section 1.06(j) of the MIPA. *See, e.g., Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912 (Del. 2017); *OSI Systems, Inc. v. Instrumentarium Corp.*, 892 A.2d 1086 (Del. Ch. 2006); *Plaze, Inc. v. Callas*, 2018 WL 1560057 (Del. Ch. March 29, 2018); *see also Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667 (N.Y. 2003); *Holt Co. of Ohio v. Ohio Mach. Co.*, 2007 WL 1674023 (Franklin County Ohio App. June 12, 2007); *Cytec Indus., Inc. v. Allnex (Luxembourg) & CY S.C.A.*, 2015 WL 3762592 (S.D.N.Y. May 15, 2015); *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 378-79 (S.D.N.Y. June 1, 2009).

86.     The balance of hardships favors Butler, as delaying commencement of the process set forth in the Calculation Objection Dispute Resolution Provision of the MIPA until threshold issues of whether Butler's claims for FEI's breaches of its covenants and agreements in Section 1.06(j) of the MIPA are subject to that process will not materially prejudice FEI, and will streamline the process if such claims are found to be outside the process set forth in the Calculation Objection Dispute Resolution Provision of the MIPA. Furthermore, the decision of such claims first by this Court may dispense with the need for the process entirely.

## COUNT III: Indemnity, Damages and Expenses for FEI's Breaches of Section 1.06(j) of the MIPA

87.     Butler restates and incorporates by reference the preceding paragraphs 1 through 86 as if fully set forth herein.

88.     The MIPA is a valid contract between Butler and Ferguson.

89.     As set forth in Section III.D., FEI has breached Section 1.06(j) of the MIPA by directly and/or indirectly taking actions with the intent of avoiding or reducing the amount of the CPP.

90.     FEI's breaches of Section 1.06(j) of the MIPA have directly and proximately caused damage to Butler, and caused Butler "Losses" as that term is defined and used in Article 8 of the MIPA.

91.     Butler's Losses have been conclusively established pursuant to Section 8.05 of the MIPA.

92.     In the alternative, if Butler's Losses have not been conclusively established pursuant to Section 8.05 of the MIPA, they will be established at the trial or other disposition of this case.

93.     Pursuant to Section 8.03 of the MIPA, Butler is entitled to indemnification from FEI for his damages and Losses directly and proximately caused by FEI's breaches of Section 1.06(j) of the MIPA including, without limitation, his expenses (including legal, consultant, accounting or other professional fees).

**WHEREFORE**, the Plaintiff, Matthew C. Butler, respectfully demands relief as follows:

A.     on Count I of the Complaint, a judgment declaring that Butler's claims asserted herein are not subject to the dispute resolution process set forth in Section 1.06I of the MIPA,

B.     on Count II of the Complaint, an order: (i) enjoining FEI from commencing the dispute resolution process set forth in Section 1.06(j) of the MIPA until the Court adjudicates this claim for declaratory relief, and (ii) further enjoining FEI from commencing the dispute resolution process set forth in Section 1.06I of the MIPA until such time as the Court fully and finally adjudicates Butler's claims for equitable relief and indemnity, which may render the MIPA's dispute resolution process unnecessary;

C.     on Count III of the Complaint, a judgment for: (i) an amount in excess of $75,000 to be proven at trial, (ii) his expenses (including legal, consultant, accounting and other

23

professional fees), and (iii) pre- and post-judgment interest; and

      D.     any and all relief, whether legal or equitable, to which Butler may be entitled.

**JURY TRIAL DEMAND**

Plaintiff, Matthew C. Butler, demands a trial by jury for all issues so triable.

Respectfully submitted,

/s/ Christopher B. Markus
Christopher B. Markus
Justin L. Knappick
Dressman Benzinger LaVelle psc
207 Thomas More Parkway
Crestview Hills, KY 41017
Phone: (859) 426-2126
Fax: (859) 341-1881
Email:  cmarkus@dbllaw.com
        jknappick@dbllaw.com

*Attorneys for the Plaintiff, Matthew C. Butler*

818901v1