**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 19-94-DLB-CJS**

**MATTHEW C. BUTLER**                                                                                    **PLAINTIFF**

**v.**                                    **MEMORANDUM OPINION AND ORDER**

**FERGUSON ENTERPRISES, INC.**                                                       **DEFENDANT**

**\*\*\* \*\*\* \*\*\* \*\*\***

This matter is before the Court upon two Motions: (1) Plaintiff Matthew C. Butler's Motion for Summary Judgment on his Indemnification Claim ("Plaintiff's MSJ") (Doc. # 105) and (2) Defendant Ferguson Enterprises, LLC (f/k/a Ferguson Enterprises, Inc.)'s Motion for Summary Judgment ("Defendant's MSJ") (Doc. # 111).  The Motions have been fully briefed and are thus ripe for review.[1]  For the following reasons, both Motions will be **denied**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

This action stems from the sale of Clawfoot Supply, LLC, d/b/a Signature Hardware ("Signature"), by Plaintiff and his father to Defendant.  (Doc. # 13 at ¶ 1).[2]  Plaintiff is an individual and resident of Kenton County, Kentucky.  (*Id.* at ¶ 22).  Defendant is a Virginia corporation with a principal place of business in Newport News, Virginia.  (*Id.* at ¶ 23).

---

[1]      Although Plaintiff has requested oral argument on his Motion for Summary Judgment (*see* Doc. # 105 at 1), because the current record is sufficient to decide the Motion, the Court concludes oral argument is not warranted.

[2]      The parties largely agree on the basic facts of the case.  For brevity and clarity, the Court will primarily refer to Plaintiff's First Amended Complaint (Doc. # 13) for these facts, except where necessary to elaborate on disagreements.

Plaintiff organized Signature as a limited liability company in 2001.  (*Id.* at ¶ 29).  Since its inception, Signature has engaged in the sale of home goods such as fixtures and hardware for use in bathrooms and kitchens.  (*Id.*).   The company generated much of its profits through internet sales and sourced many of its products from overseas manufacturers.  (*Id.*).  Prior to the sale of Signature to Defendant, Plaintiff and his father were the sole membership holders of the company.  (*Id.* at ¶ 30).  After the sale, Plaintiff served as Signature's President until he was terminated on December 6, 2017.  (Doc. # 117 at 4; Doc. # 13 at ¶ 63).

Plaintiff and his father sold Signature to Defendant pursuant to the terms of a Membership Interest Purchase Agreement, dated August 1, 2016 ("MIPA").  (Doc. # 13 at ¶¶ 1, 32; Doc. # 13-1).  In addition to a fixed purchase price of approximately $210 million, Defendant agreed to make certain payments in 2017, 2018, and 2019 contingent upon Signature reaching annual "Trading Profit" targets (such payments, the "Contingent Purchase Price").  (Doc. # 13-1 at 5-6, 9-12).   For example, if Signature's 2018 Trading Profit was greater than or equal to $31,740,538, then Plaintiff was owed $3,333,333 plus 83.3% "of the amount by which [the] 2018 Trading Profit [was] greater than the 2018 Threshold" up to a cap of $6,666,667.  (*Id.* at 12).  Pursuant to § 1.06(j), Defendant retained "sole discretion with regard to all matters relating to the operation of the company[,]" but agreed that it would "not, directly or indirectly, take any actions with the intent of avoiding or reducing the amount of the Contingent Purchase Price."  (*Id.* at 13).

The MIPA specified how Signature's Trading Profit was to be calculated and required Defendant to deliver this calculation and supporting documentation to Plaintiff within 75 days after the end of the applicable fiscal year.  (*Id.* at 9-11).  Under § 1.06(b),

Plaintiff had 30 days thereafter to deliver to Defendant a Calculation Objection, which the MIPA defined as "a reasonably detailed written statement of any objections to such Calculation and [Plaintiff's] calculation of Trading Profit for such period." (*Id.* at 11). The MIPA further specified a dispute resolution procedure for any unresolved Calculation Objections. (*Id.* at 11-12).

The MIPA also outlined each party's indemnification obligations to one another. (*Id.* at 46-49). Defendant agreed to indemnify Plaintiff for all losses resulting from, arising out of, or incurred by Plaintiff in connection with any breach of the MIPA. (*Id.* at 47). In relevant part, the procedures for asserting indemnification claims were outlined in § 8.05. (*See id.* at 48). If Plaintiff wished to pursue an indemnification claim against Defendant, the MIPA required Plaintiff to send a notice of the claim to Defendant setting forth the "amount [of the claim], if known," as well as "a description of the basis for such claim." (*Id.* at 48). Thereafter, Defendant would have 15 days to dispute the claim, but if Defendant did not timely notify Plaintiff of any dispute, then the claim would "be conclusively deemed a Loss subject to indemnification[.]" (*Id.*). The MIPA specified that its indemnity provisions were, subject to certain exceptions, "the sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claim related to [the MIPA]." (*Id.* at 49).

In fiscal year 2017, Signature's Trading Profit was sufficient to entitle Plaintiff to the whole Contingent Purchase Price for that year which Defendant paid. (Doc. # 111 at 8). In 2018, however, Signature's Trading Profit was allegedly $1,106,341 short of the threshold specified in the MIPA. (Doc. # 13 at ¶ 48). After Defendant sent Plaintiff its calculation of Signature's 2018 Trading Profit, Plaintiff sent Defendant a letter dated

March 29, 2019 which was captioned "Matt Butler's Trading Profit Calculation Objection." (*See* Doc. # 13-2).  The letter both identified supposed errors with Defendant's calculation of Signature's 2018 Trading Profit and alleged that Defendant had taken specific actions with the intent to avoid paying the 2018 Contingent Purchase Price in breach of § 1.06(j). (*See id.*).  Defendant received this letter on April 1, 2019.  (Doc. # 13 at ¶ 51).

On July 18, 2019, Plaintiff initiated this action by filing his Complaint.  (Doc. # 2). Plaintiff served Defendant with a copy of the Complaint on August 5, 2019.  (*See* Doc. # 13 at ¶ 53).  Plaintiff thereafter sent Defendant a letter dated September 25, 2019 which was captioned "Matt Butler's Notice of Claim to Indemnifying Party."  (*See* Doc. # 13-3). On October 8, 2019, Defendant, though counsel, disputed Plaintiff's indemnification claim.  (Doc. # 13 at ¶ 20).

On October 14, 2019, Plaintiff filed his First Amended Complaint With Jury Demand which is the operative pleading.  (Doc. # 13).  The First Amended Complaint alleges that Defendant breached § 1.06(j) of the MIPA by taking certain actions with the intent to avoid or reduce the 2018 Contingent Purchase Price.  (*Id.* at ¶¶ 4-7, 56-87, 98-104).  First, Plaintiff alleges that Defendant imposed a new accounting rule requiring Signature to expense all inventory held for more than 12-months as "slow moving inventory," which allegedly reduced the company's profits.  (*Id.* at ¶¶ 5, 56-64).  Second, Plaintiff alleges that Defendant terminated or reassigned key Signature employees, including Plaintiff himself, "which hampered [Signature's] ability to maximize profits."  (*Id.* at ¶¶ 6, 65-71, 79-83).  Third, Plaintiff alleges that Defendant "recast [Signature] as an 'owned store brand' for sale in [Defendant's] showrooms" which shifted revenue from Signature to Defendant.  (*Id.* at ¶¶ 72-78).  Fourth, Plaintiff alleges that Defendant paid

Signature's employees annual bonuses even though the company did not reach its profit goals, which disincentivized improving profitability.  (*Id.* at ¶¶ 7, 84-87).  Plaintiff asserts claims of indemnity under the MIPA, requests a declaratory judgment that the MIPA's dispute resolution procedures do not apply to his claims, and requests that Defendant be enjoined from commencing the dispute resolution procedures until the "threshold issues" of Defendant's supposed breach of the MIPA can be resolved.  (*Id.* at ¶¶ 88-104).  Plaintiff also alleges that his indemnification claim has been "conclusively established pursuant to [§] 8.05 of the MIPA."  (*Id.* at ¶ 102).

On November 13, 2019, Defendant moved to dismiss the First Amended Complaint.  (Doc. # 26).  After a full round of briefing (Docs. # 28 and 29), the Court issued a Memorandum Opinion and Order dismissing this action together with a corresponding Judgment.  (Docs. # 33 and 34).  This Court found it implausible that Defendant took the actions Plaintiff identified with the intent to avoid the 2018 Contingent Purchase Price.  (*Id.* at 11-24).  As to the 12-month rule, for example, the Court noted, among other things, that the rule was in place for most of 2017, and that because Butler received the entire 2017 Contingent Purchase Price, it seemed implausible that the rule was developed to avoid the 2018 payment.  (*Id.* at 20).  Plaintiff appealed (*see* Doc. # 35), and on May 10, 2021, the Sixth Circuit issued an opinion reversing the Judgment and remanding the case to this Court for proceedings consistent with the opinion.  *Butler v. Ferguson Enterprises, Inc.*, 847 F. App'x 338, 343 (6th Cir. 2021).  In pertinent part, the Sixth Circuit held as follows:

> In 2018, the [Contingent Purchase Price] threshold was $31,740,538 in trading profit.  If Signature made a penny less than this amount, [Defendant] did not owe [Plaintiff the] 2018 [Contingent Purchase Price].  But if that marginal penny was added, [Plaintiff] was entitled to $3.3 million.  Thus, that

5

one cent of profit would actually cost [Defendant] $3.3 million, reducing [Defendant's] profit to $28,407,205.  And because [Plaintiff] was entitled to 83.3% of "the amount by which the 2018 Trading Profit is greater than the 2018 Threshold" until his [Contingent Purchase Price] payment equaled $6.7 million, [Defendant] actually ended up with less than the 2018 threshold if Signature's trading profit ended anywhere between $31,740,538 and $38,407,204.  In other words, the [Contingent Purchase Price] provision gave [Defendant] two ways to maximize the money it made from Signature: end the year between $28,407,205 and $31,740,538 or above $38,407,204.

With this understanding, it would be perfectly logical for [Defendant] to attempt to come in just below the 2018 [Contingent Purchase Price] threshold.  And although an economic incentive to perform acts forbidden by contract is not necessarily indicative of a breach-of-contract claim, [Plaintiff] describes specific actions taken by [Defendant] that align with this incentive and raise reasonable inferences of [Defendant's] intent.

*Id.* at 341.  The Sixth Circuit acknowledged the possibility that Defendant "could have acted with an innocent intent and [that] discovery may show that all of its changes have perfectly legitimate business purposes."  *Id.* at 342.  Upon remand, Defendant filed its Answer, the Court issued the Scheduling Order, and this case proceeded through discovery.  (*See* Docs. # 42 and 44).  On June 5, 2023, the parties filed their Stipulation to a Nonjury Trial pursuant to which Plaintiff withdrew his jury trial demand.  (Doc. # 75).

On August 16, 2023, the parties filed respective Motions for Summary Judgment.  (Docs. # 105 and 111).  The parties have since filed Responses and Replies.  (Docs. # 117, 120, 121, and 123).  As an attachment to its Reply, Defendant included an "Objection to Inadmissible Opinion Testimony Relating to Marketing Expenditures" (the "Objection").  (Doc. # 123-1).  On October 26, 2023, Plaintiff moved to strike the Objection, arguing that it was an untimely *Daubert* motion.  (Doc. # 124).  After Defendant responded and Plaintiff replied (Docs. # 125 and 126), the Court issued an Order granting in part and denying in part the Motion to Strike.  (Doc. # 127).  Specifically, the Court declined to strike the

Objection, but gave Plaintiff an opportunity to respond to it on the merits.  (*See id.*).
Plaintiff responded to the Objection (Doc. # 128), Defendant replied (Doc. # 129), and the
Motions are now ripe for review.

## II.    ANALYSIS

### A.    Standard of Review

Plaintiff and Defendant have filed cross motions for summary judgment.  (Docs. #
105 and 111).  Summary judgment is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it might affect the outcome of the suit
under the governing law, and a dispute about a material fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the nonmoving party."  *McKay v.
Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (internal quotation marks and bracketing
omitted).  In deciding a motion for summary judgment, the court must view the evidence
and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "At the summary judgment
stage the judge's function is not himself to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine issue for trial."  *Moran v. Al Basit
LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (bracketing omitted).

"The moving party bears the burden of showing the absence of any genuine issues
of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The
movant may do so by "citing to particular parts or materials in the record, including
depositions, documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  It must produce evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

This suit is in federal court on the basis of diversity jurisdiction.  (*See* Doc. # 13 at ¶¶ 22-26).   "When determining which state's substantive law to apply, federal courts sitting in diversity look to the conflict of laws rules in the forum state, in this case, Kentucky."  *Asher v. Unarco Material Handling, Inc.*, 737 F.Supp.2d 662, 667 (E.D. Ky. 2010) (citing *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001)). This Court has previously applied Kentucky conflict of law rules and determined that Kentucky state law applies to Plaintiff's claims.  (*See* Doc. # 33 at 9-10).  Neither party has contested this prior determination.

### B.    Analysis

The Court will address Plaintiff's MSJ and Defendant's MSJ in turn.

### 1.    Plaintiff's MSJ

Plaintiff moves for summary judgment on his indemnification claim against Defendant.  (Doc. # 105).  According to Plaintiff, Defendant "conceded liability for [the 2018 Contingent Purchase Price] by not responding to his objection" within the timeframe specified in the MIPA.  (*Id.* at 3) (quoting *Butler*, 847 F. App'x at 340).

Defendant agreed to indemnify Plaintiff for all losses resulting from, arising out of, or incurred by Plaintiff in connection with any breach of the MIPA.  (Doc. # 13-1 at 47). Section 8.05 of the MIPA specified the following relevant procedures for asserting indemnification claims:

> In the event of a claim that does not involve a Third Party Claim being asserted against it, the Indemnified Party shall send a notice of claim to the Indemnifying Party.  The notice of claim shall set forth the amount, if known, or, if not known, an estimate of the foreseeable maximum amount of claimed Losses (which estimate shall not be conclusive of the final amount of such Losses) and a description of the basis for such claim.   The Indemnifying Party will have fifteen (15) business days from receipt of such notice of claim to dispute the claim and will reasonably cooperate and assist the Indemnified Party in determining the validity of the claim for indemnity. If the Indemnifying Party does not give notice to the Indemnified Party that it disputes such claim within fifteen (15) days after its receipt of the notice of claim, the claim specified in such notice of claim will be conclusively deemed a Loss subject to indemnification hereunder.

(*Id.* at 48).

According to Plaintiff, he furnished Defendant with written notice of his indemnification claim on two relevant occasions.[3]  (Doc. # 105 at 11).  The first was when he sent Defendant his letter of March 29, 2019.  (*Id.*).  The second was when he served Defendant with his original Complaint on August 5, 2019.  (*Id.*).  As Plaintiff notes,

---

[3]    Plaintiff also alleges that he notified Defendant of his indemnification claim through his September 25, 2019 letter.  (Doc. # 13 ¶ 19).  Defendant disputed this letter 13 days later on October 8, 2019.  (*Id.* ¶ 20).

Defendant did not dispute any supposed indemnification claim within 15 days of receiving the March 29th letter or the original Complaint.  (*Id.*).  Plaintiff accordingly claims that his indemnification claim has been conclusively established.  (*Id.*).  The Court disagrees.

Defendant's obligation to dispute an indemnification claim under § 8.05 is only triggered upon receipt of a "*notice* of [the] claim" setting forth (i) the amount of claimed losses (or an estimate thereof) and (ii) the basis for the claim.  (Doc. # 13-1 at 48 (emphasis added)).  On its face, Plaintiff's March 29th letter does not purport to be a notice of any indemnification claim.  (*See* Doc. # 13-2).  Instead, the letter is facially a Calculation Objection made pursuant to § 1.06(b).  (*See id.*).  The letter is captioned "Matt Butler's 2018 Trading Profit Calculation Objection," specifies that it is being sent pursuant to "[§] 1.06 of [the MIPA]," and references the MIPA's dispute resolution procedure for any unresolved Calculation Objection.  (*See id.*).  Although the letter identifies the amount of Plaintiff's claimed losses (*i.e.*, the 2018 Contingent Purchase Price) and the potential basis for an indemnification claim (*i.e.*, actions of Defendant that supposedly violated § 1.06(j)), it does not expressly or implicitly reference indemnification or otherwise assert an indemnification claim.  (*See id.*).  The Court accordingly agrees with Defendant that the letter "entirely failed to apprise [Defendant] that [Plaintiff] was presenting an indemnification claim—as distinct from a Calculation Objection[.]"  (*See* Doc. # 120 at 9).  Thus, the letter "failed to constitute 'notice' of such a claim in the most fundamental sense of that term."  (*See id.*).

In his Reply, Plaintiff cites *Atsco Holdings Corp. v. Air Tool Serv. Co.*, which he claims provides "[s]trong support for [his] position[.]"  (Doc. # 121 at 5 (citing Case No.

1:15CV1586, 2017 U.S. Dist. LEXIS 224626 (N.D. Ohio Dec. 20, 2017)).[4]   The *Atsco* case involved a dispute between the plaintiff and the defendant arising out of an asset purchase agreement ("APA").   *Id.* at \*2.   Through the APA, the defendant represented that the assets being sold to the plaintiff "were well maintained and in good working condition[,]" and agreed to indemnify the plaintiff for all losses incurred by the plaintiff resulting from any misrepresentation in the APA.   *Id.* at \*2-4, 6-7.   Section 11.2.3 of the APA required a party asserting an indemnification claim to provide notice of the claim "specifying the nature of the [c]laim and the amount or the estimated amount thereof[.]".   *Id.* at \*7-8.   By letter dated October 16, 2014, the plaintiff notified the defendant of certain deficiencies with the assets together with an estimate of the cost of replacing, repairing, or otherwise remedying the deficiencies.   *Id.* at \*10-11; (Doc. # 122-2).   This letter did not reference indemnification and was sent pursuant to an unrelated section of the APA.   (*See* Doc. # 122-2).   In finding that the letter nevertheless satisfied § 11.2.3's requirements, the *Atsco* court held that—

> [w]hile [the] [d]efendant[ ] [is] correct that a [c]laim must be submitted, the [c]ourt finds the October 16, 2014 letter, while purportedly brought in regards to the inventory provision of [§] 2.3, was sufficient to place [the] [d]efendant[ ] on notice of a claim.   Section 11's claim notice provision only requires that a [c]laim notify the [d]efendant[ ] of the claim, specify the nature of the claim and the amount or an estimate of the amount.   The October 16th letter complies with these requirements.

*Atsco*, 2017 U.S. Dist. LEXIS 224626, at \*11.

As an initial matter, the Court notes that the *Atsco* case is merely persuasive authority which the Court is not required to follow.   Moreover, the letter at issue in *Atsco* is materially different from Plaintiff's letter.   In *Atsco*, the plaintiff's letter expressly

---

[4]   Because the *Atsco* case in unavailable on Westlaw, the Court will refer to its Lexis Advance citation.

acknowledged that it was asserting claims against the defendant.  (*See* Doc. # 122-2 at 2 ("We reserve the right to bring *additional claims* if we have further reason to believe your representations and warranties are inaccurate.") (emphasis added)).  In contrast, Plaintiff's March 29th letter contains no express assertion of any claim.  (*See* Doc. # 13-2).  Although Plaintiff's letter concludes with a "demand[ ] [for] the maximum 2018 Contingent Purchase Price" (*id.* at 8), this demand is best interpreted as asserting a Calculation Objection rather than an indemnification claim for the reasons stated above.  Indeed, Plaintiff immediately follows his demand by referring to the MIPA's dispute resolution procedures for any unresolved Calculation Objections.  (*See id.*).  Based on the above, the Court concludes that the March 29th letter was not sufficient notice under § 8.05 of the MIPA.

Plaintiff separately claims that the August 5, 2019 service of the original Complaint on Defendant constituted adequate notice of his indemnification claim.  (Doc. # 105 at 11).  As Plaintiff notes, his original Complaint expressly claimed that "[p]ursuant to Section 8.03 of the MIPA, [Plaintiff] is entitled to indemnification from [Defendant] for his damages and Losses[.]"  (*Id.* (quoting Doc. # 2 at ¶ 93)).

Although Defendant's receipt of the original Complaint could possibly constitute sufficient notice, the Court concludes that Plaintiff has not established his entitlement to summary judgment on this issue.  Plaintiff does not cite—and the undersigned is unaware of—any Kentucky or Sixth Circuit caselaw holding that service of pleadings alone can satisfy contractual notice provisions.  In *Mullins v. Wyatt*—which Plaintiff cites (*see* Doc. # 121 at 8)—the Supreme Court of Kentucky held that a plaintiff could satisfy a specific statutory notice requirement for asserting a breach of warranty action through service of

the summons and complaint.  887 S.W.2d 356, 356-58 (Ky. 1994).  However, *Mullins* says nothing about whether the same logic applies to contractual notice provisions like § 8.05.  And the only case within the Sixth Circuit that Plaintiff cites—*Bank One, N.A. v. Echo Acceptance Corp.*—is materially distinguishable from this case.  (*See* Doc. # 105 at 11) (citing 522 F.Supp.2d 959 (S.D. Ohio 2007)).  The *Bank One* case involved a situation where the plaintiff sent the defendant a copy of a third-party complaint together with a letter expressly requesting indemnification.  *See id.* at 968.  In determining that the defendant was sufficiently notified of the plaintiff's claim, the *Bank One* court noted that the letter—which was the "[m]ost important[ ]" factor in its notice finding—was itself sufficient notice.  *See id.*

Based on the above, the Court concludes that Plaintiff has not shown his entitlement to judgment as a matter of law on his indemnification claim.  Plaintiff's MSJ (Doc. # 105) is accordingly **denied**.

### 2.    *Defendant's MSJ*

Defendant moves for summary judgment on each of Plaintiff's claims.  (Doc. # 111).  According to Defendant, discovery in this matter has revealed no evidence that it acted with the intent to deprive Plaintiff of the 2018 Contingent Purchase Price in violation of § 1.06(j).  (*Id.* at 5).  Defendant instead claims that "the only evidence relating to [Defendant's] reasons for the challenged actions shows that [Defendant] took each of them for legitimate business purposes having nothing to do with [Plaintiff's] earn-out payments."  (*Id.*).

As an initial matter, the Court must identify which of Plaintiff's allegations against Defendant are at issue before the Court.  At the pleadings stage, Plaintiff identified four

actions that Defendant took allegedly in violation of § 1.06(j): (1) implementing the 12-month rule, (2) terminating and/or reassigning key employees, (3) recasting Signature as an "owned store brand" of Defendant, and (4) paying bonuses to employees even though Signature did not meet its profitability goals.  (Doc. # 28 at 5-9).  In his Response, however, Plaintiff identifies the following five actions of Defendant's as violative of the MIPA:

> (1) refusing to repeal the 12-Month Rule at Signature even after [Plaintiff] repeatedly informed his . . . boss . . . of the negative effects of that Rule, (2) paying more than $1 million in unearned employee bonuses to Signature employees (other than [Plaintiff]) after February 2018, (3) significantly increasing advertising spend after February 2018, (4) failing to challenge [an entity called] Barclay Products' unfair competition which allowed Barclay to circumvent Signature and buy directly from Signature's suppliers, and (5) promising [Plaintiff] that it would credit his 2018 earnout calculation $1.1 million to ameliorate the effects of the 12-Month Rule but refusing to do so.

(Doc. # 117 at 6).  Plaintiff also asserts a new claim as to the enforceability of Defendant's promise to credit Signature's 2018 Trading Profit by $1.1 million.  (*Id.* at 22-24).

Upon review, Plaintiff appears to have abandoned his claims regarding Defendant's implementation of the 12-month rule, termination and/or reassignment of key Signature employees, and recasting of Signature as Defendant's owned store brand. Plaintiff's claim regarding Defendant's payment of bonuses is the only claim he has consistently raised over time.  That said, although Plaintiff's claims regarding Defendant's failure to repeal the 12-month rule, failure to challenge Barclay's alleged unfair competition, and failure to follow up on its promise to credit Signature's 2018 Trading Profit by $1.1 million appear new, they were discussed in the First Amended Complaint. (*See* Doc. # 13).

However, Plaintiff's claims regarding the enforceability of Defendant's promise to credit Signature's Trading Profit and Defendant's alleged increase of advertising spending were not adequately pled and are thus not properly before this Court.  Nowhere in the First Amended Complaint does Plaintiff assert a claim regarding the enforceability of Defendant's promise as to the $1.1 million Trading Profit credit.  (*See* Doc. # 13).  And Plaintiff did not expressly raise a claim or theory regarding Defendant's alleged increase of advertising spending in the First Amended Complaint.  Indeed, Plaintiff only briefly references advertising spending in his operative pleading—and only in the context of his now abandoned claims—as follows:

> 79.    Immediately after terminating [Plaintiff] and removing his substantial e-commerce experience from the Company, [Defendant] hired one of its showroom managers from California named Keith Hammond ("Hammond") who had no meaningful e-commerce experience.

> 80.    Hammond's lack of skill, applicable experience, and directive to immediately shift the Company's sales to [Defendant's] showrooms is evidenced by the Company's performance since he took over.  Specifically, since Hammond was installed at the Company by [Defendant], the Company's advertising expenses increased nearly $500,000 per month over historical benchmarks, which included expenses for ineffective advertising focused on improving showroom sales (*i.e.*, professional team sponsorships, radio advertising, and magazines) as opposed to the Company's historically lucrative e-commerce business, and [Defendant] increased the Company's prices while at the same time branding the Company's products as [Defendant's] "owned store brand" products.

(Doc. # 13 at ¶¶ 79-80).  Importantly, Plaintiff never expressly or implicitly claims that Defendant's increase of advertising expenditures constituted a breach of the MIPA.  (*See id.*).

"A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion."  *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting 10A

Charles Alan Wright, et al., Federal Practice and Procedure § 2723 (3d ed. Supp.2005)). And "a plaintiff may not expand its claims to assert new theories . . . in response to summary judgment[.]"  *RJ Control Consultants, Inc. v. Multiject, LLC*, 981 F.3d 446, 454 n.6 (6th Cir. 2020).  Thus, the Court will not consider Plaintiff's unpled claims or theories.[5]

Having outlined which of Plaintiff's claims and theories are still properly before the Court, the Court will now address Defendant's arguments for summary judgment.  Plaintiff alleges that Defendant has taken specific actions in violation of § 1.06(j) of the MIPA. This provision provides as follows:

> Subject to the terms of this Agreement, subsequent to Closing, [Defendant] shall have sole discretion with regard to all matters relating to the operation of the Company; provided that (i) as long as [Plaintiff] continues to be employed by the Company, [Defendant] shall endeavor in good faith to communicate with [Plaintiff] regarding the general operations of the Company and (ii) *[Defendant] shall not, directly or indirectly, take any actions with the intent of avoiding or reducing the amount of the Contingent Purchase Price.*

(Doc. # 13-1 at 13) (emphasis added).

Defendant generally argues that Plaintiff "only identifies the **conduct** by [Defendant] that [Plaintiff] is challenging; [he] does not . . . identify any evidence that the conduct was taken with wrongful *intent*."  (Doc. # 111 at 21-22) (emphasis in original). According to Defendant, Plaintiff did not uncover any evidence in discovery that

---

[5]     The parties have filed briefing on the issue of the admissibility of certain expert witness testimony.  (*See* Docs. # 123-1, 124, 125, 126, 128, and 129).  This testimony was offered by Plaintiff and a witness named Mike Kolar and concerns the effectiveness of Defendant's marketing expenditures.  Having concluded that Plaintiff failed to adequately plead a claim or theory regarding Defendant's marketing expenditures, the Court accordingly concludes that the expert testimony is irrelevant and should be excluded.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *see also Barber v. Milbank Ins. Co.*, CIVIL ACTION NO. 5:21-213-KKC-EBA, 2023 WL 3721197, at *2 (E.D. Ky. May 30, 2023) ("In all cases, experts must pass *Daubert* scrutiny.").  The Court need not—and shall not—address the parties' other arguments regarding the admissibility of such testimony.

Defendant acted with an intent to avoid or reduce the 2018 Contingent Purchase Price. (Doc. # 111 at 5).   Instead, Defendant argues that evidence produced in discovery shows that the actions of Defendant that Plaintiff identifies had "perfectly legitimate business purposes."  (*Id.* (quoting *Butler*, 847 F. App'x at 342).   Regarding its payment of employee bonuses, for example, Defendant claims that the bonuses were paid "to boost morale, not to affect [Plaintiff's] earn-out payments."  (Doc. # 111 at 24).   In support, Defendant points to deposition testimony offered by Chip Devine and Keith Hammond, two of Signature's executives.  (*Id.* at 14-15).   Devine and Hammond both testified that the decision to pay the bonuses was made to boost morale.  (*Id.* at 15).   Additionally, Devine answered in the negative a question as to whether Plaintiff's earn-out payment was a factor in the decision to pay the employee bonuses.  (*Id.*).

In his Response, Plaintiff argues that summary judgment is particularly inappropriate in this case because Defendant's intent is at issue.  (Doc. # 117 at 14 (quoting *Marohnic v. Walker*, 800 F.2d 613, 617 (6th Cir. 1986)).  Plaintiff also argues that he need not present direct evidence of Defendant's intent to survive summary judgment or prevail at trial.  (Doc. # 117 at 3).  Additionally, Plaintiff argues that the parties dispute certain material facts and that this alone precludes entry of summary judgment.  (Doc. # 117 at 15-16).  Plaintiff also relies on the Sixth Circuit's prior decision in this matter.  (Doc. # 117 at 2, 5, 16, 18-22, 24-25).   The Sixth Circuit observed that Defendant had an economic incentive to avoid the 2018 Contingent Purchase Price and that Plaintiff had "describe[d] specific actions taken by [Defendant] that align with this incentive and raise reasonable inferences of [Defendant's] intent."  *Butler*, 847 F. App'x at 341.   Regarding Defendant's payment of bonuses, the Sixth Circuit held that "[b]y paying bonuses to other

Signature employees, [Defendant] could avoid paying an even larger bonus to [Plaintiff]," and that it was accordingly "plausible to conclude that at least one of the motivations for the new policy was to avoid or reduce [the 2018 Contingent Purchase Price]." *Id.* at 342.

Upon review, Defendant appears to have produced substantial evidence that its actions "ha[d] perfectly legitimate business purposes." *Butler*, 847 F. App'x at 342. Nevertheless, the Court concludes that entry of summary judgment in Defendant's favor is not appropriate. The key issue in this case is whether Defendant acted with the intent to avoid the 2018 Contingent Purchase Price. The Sixth Circuit has held that "summary judgment is particularly inappropriate when intent is at issue, because evidence of intent must generally be inferred form the surrounding facts and circumstances." *Marohnic*, 800 F.2d at 617. Moreover, the Sixth Circuit has already held that Plaintiff raised reasonable inferences that Defendant acted with an intent to avoid paying Plaintiff his 2018 earn-out payment. Although the Sixth Circuit addressed Plaintiff's claims at the pleadings stage and not at summary judgment, the Court concludes that the reasonable inferences are still somewhat present. Entering summary judgment in Defendant's favor would require the Court to weigh these inferences against Defendant's evidence which is not appropriate at this stage. *See Moran*, 788 F.3d at 204. Based on the above, Defendant's MSJ (Doc. # 111) is **denied**. Having concluded that Plaintiff survives summary judgment on his employee bonuses theory, the Court need not—and shall not—address Plaintiff's other theories.

As discussed above, the parties have filed a Stipulation to a Nonjury Trial. (Doc. # 75). Thus, to the extent that this case proceeds to trial, it will be adjudicated at a bench trial. The Court advises the parties that they should not interpret the Court's denial of

Defendant's MSJ as a sign of how the Court views the merits of Plaintiff's claims or the likely outcome of any future bench trial.  This is because "the burdens and standards that apply to a summary judgment motion and a bench trial are quite different." *Howard Indus., Inc. v. BADW Grp., LLC*, No. 20-5596, 2021 WL 2328477, at *4 (6th Cir. Mar. 2, 2021). At summary judgment, the Court's "function [is] not to weigh the evidence and determine the truth of the matters asserted, but to determine whether there [is] a genuine dispute for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  At a bench trial, on the other hand, the Court may make credibility determinations and is "not required to view the evidence in the light most favorable to the non-moving party[.]" *Howard Indus., Inc.*, 2021 WL 2328477, at *4 (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)) (internal quotation marks omitted).  Moreover, it will be Plaintiff's burden to prove that Defendant breached the MIPA if this case proceeds to trial.  *See Kidd v. Abbott Laby's*, No. 2:10-cv-157, 2011 WL 1527948, at *12 (S.D. Ohio Apr. 20, 2011).

## III.   CONCLUSION

Accordingly, it is **ORDERED** that:

(1)      Plaintiff Matthew C. Butler's Motion for Summary Judgment on his Indemnification Claim (Doc. # 105) is **DENIED**;

(2)      Defendant Ferguson Enterprises, LLC (f/k/a Ferguson Enterprises, Inc.)'s Motion for Summary Judgment (Doc. # 111) is **DENIED**; and

(3)      The parties shall file a Joint Status Report **within thirty (30) days from the date of this Order** indicating whether they would be amendable to pursuing

mediation, either privately or court-facilitated, on Plaintiff's claims, and proposed available dates for the bench trial.

     This 7th day of March, 2024.

**Signed By:**

_**David L. Bunning**_

**United States District Judge**

K:\DATA\ORDERS\Cov2019\19-94 MOO re MSJs.docx